

FILED
Dec 11, 2019
09:10 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT COOKEVILLE

| | | |
|---|---|---|
| BILLY KEITH WATTS | ) | Docket No.: 2019-04-0113 |
| Employee, | ) | |
| v. | ) | |
| | ) | |
| GRAPHIC PACKAGING, INTL. | ) | State File No.: 13303-2019 |
| Employer, | ) | |
| And | ) | |
| | ) | |
| ARCH INS. CO., | ) | Judge Robert Durham |
| Insurer. | ) | |

---

### EXPEDITED HEARING ORDER DENYING BENEFITS

---

The Court conducted an expedited hearing on December 3, 2019 to determine whether Mr. Watts is likely to prove his injury is compensable given GPI's asserted defense of willful misconduct. The Court holds he is not likely to do so.

### History of Claim

Mr. Watts worked as a press operator for GPI on February 20, 2019 when he tried to pull out excess paper from an active press with his right hand. At the hearing, Mr. Watts testified that the paper was sticking out a bit when he grabbed it. In his deposition, which was made an exhibit, he explicitly stated he reached into the press to pull out the paper. None of the pleadings or discovery corroborated his hearing testimony.

In any event, the belts on the press pulled his hand in, causing extensive damage.[1] Mr. Watts went to the emergency room and later underwent a drug test, which returned positive for marijuana.[2]

---

[1] Mr. Watts underwent five surgeries on his hand, but still lost his ring and little finger and the tip of his middle finger. He is scheduled to undergo another surgery to release scar tissue.

[2] GPI did not pursue intoxication as an affirmative defense, but raised it only as grounds for Mr. Watts' termination.

Mr. Watts became an employee of GPI in June 2018 when it bought PFP, LLC, the company where Mr. Watts had worked for five years. As with most employees, his essential job duties did not change upon GPI's purchase. Mr. Watts worked second shift and Steve Chappell, who also trained him on press operation, was his only supervisor throughout his employment with PFP and GPI.

PFP did not have any written safety or disciplinary policies. Although there were rules of procedure that employees were expected to follow, Mr. Watts described the atmosphere as "laid back." Nevertheless, in May 2017, he received a written warning from Tom White, PFP's plant manager, after the day-shift supervisor observed him wiping down a press plate while the machine was running[3] In the warning, Mr. White described the action as "unacceptable." This is the only documented disciplinary action taken against Mr. Watts before his accident.

After taking over, GPI began implementing its policies, including those on safety. Management met with its new employees and educated them on new safety procedures, which included the "Seven Safety Absolutes." One of the "Absolutes" was a prohibition against "reaching into moving equipment in violation of established safe operating procedures." In September 2018, Mr. Watts signed a document acknowledging his receipt and understanding of the "Safety Absolutes" and that he could be terminated for violating one of them. GPI displayed posters of these principles around the facility.

GPI also provided Mr. Watts with a written policy emphasizing safety and the responsibility of all employees to maintain a safe working environment. It stated that it was the employee's duty to report any unsafe work practices and, if a supervisor were involved, the report should be made to Human Resources. Mr. Watts signed an acknowledgement agreeing to abide by these provisions. In addition, Mr. Watts signed a "Commitment to Safety Form" that reiterated GPI's emphasis on safety, and in which he agreed to "abide by the rules and regulations of the company at all times."

Mr. Watts testified that he knew and understood his responsibilities as outlined in these documents at the time he signed them. He confirmed that he was aware of the dangers of reaching into moving equipment, and that doing so violated GPI's "Safety Absolutes." Mr. Watts further conceded that he witnessed several verbal reprimands by management after GPI took over and knew of at least one written warning issued after a co-worker cut himself.

However, Mr. Watts stated that after GPI's training, Mr. Chappell told him and other operators to use their own discretion about abiding by GPI's safety policies, but if they decided not to, they "better not get caught." Further, he saw several operators, including Mr. Chappell himself, reach into the presses to remove paper. Following Mr.

---

[3] Mr. White remains the plant manager at GPI.

2

Watts' written warning in 2017, Mr. Chappell even asked him to stand in front of a camera so Mr. Chappell could wipe down a press plate on a running machine without being seen.[4] Mr. Watts admitted that he never informed Mr. White or anyone in Human Resources about these violations.

In addition to Mr. Watts, Mr. White also provided testimony. He stated that safety was one of GPI's highest priorities. He believed no employee should undertake a task if it could not be done safely, and he communicated this to Mr. Watts in the 2017 warning. He stated it was the primary responsibility of the shift supervisor to report safety violations from the floor. Verbal warnings were part of GPI's progressive disciplinary system and shift supervisors were authorized to issue those; however, any further disciplinary action had to be taken by himself and Human Resources. He remembered at least six written warnings for safety violations that he issued as GPI's plant manager, although none for reaching into a moving machine before Mr. Watts' accident.

As to Mr. Chappell's alleged statements and safety violations, Mr. White testified that once he learned of Mr. Watts' allegations following his deposition and he investigated them thoroughly, he demoted Mr. Chappell from shift supervisor. He further stated that if he had known of these alleged incidents earlier, he would have certainly investigated, and if true, would have taken disciplinary action then. However, no one came to him or other managers asserting Mr. Chappell's alleged safety violations or failure to discipline safety infractions before Mr. Watts' accident. He concluded by stating that GPI fired Mr. Watts on March 6, 2019 for violating company policy, but it would have otherwise accommodated his limitations.

**Findings of Fact and Conclusions of Law**

Mr. Watts must present sufficient evidence establishing that he is likely to prove at trial that he is entitled to workers' compensation benefits. *See* Tenn. Code Ann. § 50-6-239(d)(1)(2019). GPI may present evidence of an affirmative defense, such as willful misconduct, to illustrate a decreased likelihood that Mr. Watts would prevail at trial, but the ultimate burden of proof at this expedited hearing remains with Mr. Watts. *See Burnett v. Builders Transp.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 5 at *8, 9 (Feb. 8, 2018).

Here, the parties stipulated that Mr. Watts sustained an injury that arose primarily out of and in the course and scope of his employment. However, GPI contended that its willful misconduct defense under Tennessee Code Annotated section 50-6-110(a)(1) makes it unlikely that Mr. Watts will succeed at trial.

The Appeals Board has set out several elements that an employer must prove to

---

[4] Neither party called Mr. Chappell as a witness.

3

show willful misconduct. First, there must be a violation of an actual safety rule. *See Neal v. Connect Express, LLC* 2017 TN Wrk. Comp. App. Bd. LEXIS 9 at *10 (Jan. 30, 2017). A prohibition against placing one's hand into moving machinery is one of GPI's "Seven Safety Absolutes" that GPI communicated to its employees through several methods.

As to a violation of this rule, Mr. Watts admitted in his deposition that he reached into the press to remove scrap paper. Several of the written discovery requests were prefaced on the assumption that he reached into the machine, and his responses did nothing to correct that assumption. No evidence suggested that he ever told anyone that he did not actually reach into the machine. Nevertheless, at the hearing, Mr. Watts testified that the scrap paper actually protruded slightly from the machine, and this is what he grabbed rather than placing his hand into the press. The Court does not find Mr. Watts' testimony credible on this point. Thus, the Court finds that Mr. Watts is unlikely to rebut the first element of willful misconduct at trial.

The Court now turns to the remaining elements of willful misconduct: (1) The employee's actual, as opposed to constructive, notice of the rule; (2) The employee's understanding of the danger involved in violating the rule; (3) The employer's bona fide enforcement of the rule; and (4) The employee's lack of a valid reason for violating the rule. *Roper v. Allegis Group*, 2017 TN Wrk. Comp. App. Bd. LEXIS 9, at *10 (Feb. 10, 2017.)

The first two elements are essentially undisputed. Mr. Watts testified that he was aware of the policy against reaching into a moving machine. He signed several documents attesting to his awareness and understanding of GPI's safety policies and his willingness to abide by them. He also testified that he knew the dangers of placing his hand in the machine and admitted to such in his discovery responses.

The third element, bona fide enforcement, is the crux of the dispute between the parties. Mr. White, GPI's plant manager, testified that when GPI took over, safety became a top priority and this shift was communicated to the employees. Mr. Watts admitted that GPI was much stricter than the "laid-back" approach used by its predecessor. He knew that, should Mr. White or someone from Human Resources catch him violating one of the "Safety Absolutes" he would likely be disciplined, perhaps terminated.

Mr. White testified that if he became aware of a violation, he would investigate and ensure appropriate measures were taken. As evidence of enforcement, he cited several instances where he gave written warnings for various safety violations in the months following GPI's take-over. Mr. Watts admitted he knew of a warning being issued to a co-worker who had cut himself.

4

Although GPI offered no proof of disciplinary action stronger than a written warning, it must be recalled that it had only been in charge for approximately eight months at the time of Mr. Watts' injury. In addition, both parties testified as to verbal warnings issued by management. Further, even while employed with PFP, Mr. White displayed a commitment to enforcing the specific rule against reaching into active equipment. When the first-shift supervisor advised him that he saw Mr. Watts wipe down a plate on a moving press, he issued a written warning. Thus, the Court finds that the evidence is likely to support GPI's contention that, with the exception of Mr. Chappell, management was committed to enforcing its safety policies.

However, Mr. Watts argued that Mr. Chappell's failure to enforce the rules negated any commitment or action as to other GPI management. He contended that since his immediate supervisor regularly allowed such violations, and in fact committed these violations himself, GPI will be unable to prove bona fide enforcement at trial. Given the facts of this case, the Court finds his argument unpersuasive.

Although the unrebutted evidence established that Mr. Chappell routinely ignored violations of GPI's safety policy, he also made it clear to the second-shift employees that if they were caught by other managers committing unsafe acts, they would likely be fired. He took steps to hide one violation from Mr. White by asking Mr. Watts to step in front of the camera while he wiped of a plate. Mr. Chappell was the only one with any supervisory authority on second shift, but his authority as to discipline was limited to only giving verbal warnings and reporting violations to Mr. White, who would then determine the level of discipline necessary.

In addition, Mr. Watts admitted that he did not report any second shift safety violations or Mr. Chappell's failure to properly supervise the operators, even though he knew it was his obligation to do so. If he had reported him, GPI could have taken corrective action much sooner. Finally, once Mr. White became aware of Mr. Chappell's behavior, GPI disciplined him by demoting him from supervisor. Given these facts, the Court cannot find that Mr. Chappell's actions or inactions established that GPI is unlikely to show bona fide enforcement of the safety rule at trial.

As to the last element regarding a valid excuse, Mr. Watts maintained that to shut down the press to remove a paper jam could potentially stop the process for several minutes and result in more waste paper, thus reducing productivity. However, he provided no evidence that GPI encouraged or condoned safety violations to maintain productivity. Thus, the Court finds that Mr. Watts' excuse is likely insufficient to prevail against a defense of willful misconduct. *See Gonzales v. ABC Prof'l Tree Services*, 2014 TN Wrk. Comp. App. Bd. LEXIS 2, *27 (Nov. 10, 2014).

5

IT IS, THEREFORE, ORDERED that:

1. Mr. Watts' request for workers' compensation benefits is denied at this time.

2. This case is set for a Scheduling Hearing on **January 23, 2020**, at **10:30 a.m. Central Time**. The parties must call 615-253-0010 or toll-free at 855-689-9049 to participate. Failure to call might result in a determination of the issues without your participation.

ENTERED December 11, 2019.

**Robert V. Durham, Judge**
**Court of Workers' Compensation Claims**

## APPENDIX

Exhibits:

1. Responses to Interrogatories
2. Responses to Requests for Admission
3. Separation Notice
4. Safety Absolutes
5. Poster of Safety Absolutes
6. Safety Policy
7. Written Warning
8. Commitment to Safety Statement
9. Wage Statement
10. First Report of Injury
11. Drug Test Results
12. Notice of Denial
13. Transcript of Mr. Watts' Deposition
14. Employee Performance Review

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Notice of Expedited Hearing

5. GPI's Pre-Hearing Statement
6. Mr. Watts Pre-Hearing Statement

## CERTIFICATE OF SERVICE

A copy of the Expedited Hearing Order Denying Benefits was sent as indicated on December 11, 2019.

| Name | Certified Mail | Email | Service sent to: |
|---|---|---|---|
| David Goodman | | X | dgoodman@forthepeople.com |
| Benjamin Reese | | X | btr@smrw.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

7



<u>Expedited Hearing Order Right to Appeal:</u>

If you disagree with this Expedited Hearing Order, you may appeal to the Workers' Compensation Appeals Board. To appeal an expedited hearing order, you must:

1.  Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within seven business days* of the date the expedited hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon all parties.

2.  You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of the appeal.**

3.  You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. If a transcript of the proceedings is to be filed, a licensed court reporter must prepare the transcript and file it with the court clerk *within ten business days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within ten business days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4.  If you wish to file a position statement, you must file it with the court clerk within *ten business days* after the deadline to file a transcript or statement of the evidence. The party opposing the appeal may file a response with the court clerk *within ten business days* after you file your position statement. All position statements should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# EXPEDITED HEARING NOTICE OF APPEAL

Tennessee Division of Workers' Compensation
www.tn.gov/labor-wfd/wcomp.shtml
wc.courtclerk@tn.gov
1-800-332-2667

Docket #: _____

State File #/YR: _____

**Employee**

_____

v.

_____

**Employer**

## Notice

Notice is given that _____

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the order(s) of the Court of Workers' Compensation Claims at _____

to the Workers' Compensation Appeals

_____ Board. [List the date(s) the order(s) was filed in the court clerk's office]

**Judge**_____

## Statement of the Issues

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

## Additional Information

**Type of Case** [Check the most appropriate item]

☐ Temporary disability benefits
☐ Medical benefits for current injury
☐ Medical benefits under prior order issued by the Court

## List of Parties

**Appellant (Requesting Party):**_____At Hearing: ☐Employer ☐Employee

Address:_____

Party's Phone:_____ Email:_____

Attorney's Name:_____ BPR#: _____

Attorney's Address:_____ Phone: _____

Attorney's City, State & Zip code:_____

Attorney's Email:_____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ SF#: _____ DOI: _____

## Appellee(s)

**Appellee (Opposing Party):** _____ At Hearing: ☐ Employer ☐ Employee

Appellee's Address: _____

Appellee's Phone: _____ Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Address: _____ Phone: _____

Attorney's City, State & Zip code: _____

Attorney's Email: _____

*** Attach an additional sheet for each additional Appellee ***

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this
Expedited Hearing Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties
and/or their attorneys in this case in accordance with Rule 0800-02-22.01(2) of the Tennessee Rules
of Board of Workers' Compensation Appeals on this the _____ day of _____, 20 ___

[Signature of appellant or attorney for appellant]  _____



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

## AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____     2. Address: _____

3. Telephone Number: _____     4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                                          RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month      Medical/Dental  $ _____ per month

Groceries          $ _____ per month      Telephone      $ _____ per month

Electricity        $ _____ per month      School Supplies $ _____ per month

Water              $ _____ per month      Clothing       $ _____ per month

Gas                $ _____ per month      Child Care     $ _____ per month

Transportation     $ _____ per month      Child Support  $ _____ per month

Car                $ _____ per month

Other              $ _____ per month (describe: _____ )

10. Assets:

Automobile              $ _____      (FMV) _____

Checking/Savings Acct. $ _____

House                   $ _____      (FMV) _____

Other                   $ _____      Describe: _____

11. My debts are:

Amount Owed                    To Whom

_____        _____

_____        _____

_____        _____

_____        _____

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____

LB-1108 (REV 11/15)                                    RDA 11082